**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MICHAEL H. DALTON,**

    **Plaintiff,**

                                  **Civil Action 2:20-cv-3636**
    **v.**                              **Judge James L. Graham**
                                  **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DBI").  This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17) and the administrative record (ECF No. 11).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** Plaintiff's Statement of Errors and **OVERRULE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four § 405(g) for further consideration consistent with this Report and Recommendation.

## I.      BACKGROUND

Plaintiff filed an application for DBI on February 8, 2017, alleging that he became disabled on August 11, 2016.  (R. at 195.)  Plaintiff's application was denied initially in March 2016, and upon reconsideration in April 2017.  (R. at 94–105, 106, 107–120, 121.)  A hearing was held on March 13, 2019, before an Administrative Law Judge ("ALJ"), who issued an

unfavorable determination on April 11, 2019. (R. at 60–93, 18–38.) The Appeals Council declined to review that unfavorable determination, and thus, it became final. (R. at 1–6.)

Plaintiff seeks judicial review of that final determination. He alleges a single assignment of error: the ALJ failed to properly evaluate medical opinions from his treating physician, Douglas A. Myers, MD. The undersigned finds that Plaintiff's claim has merit.

## II.    THE ALJ's DECISION

The ALJ issued his decision on April 11, 2019, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 18–38.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since August 11, 2016, his application date. (R. at 23.) At step two, the ALJ found that Plaintiff

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

had the following severe impairments: SLAP tear, rotator cuff tear and degenerative joint disease

of the right shoulder.  (*Id*.)  At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 25.)

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[2] as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined
> 20 C.F.R. § 404.1567(b) except the claimant is limited to occasional pushing and
> pulling with the right arm; no climbing ladders, ropes, or scaffolds or crawling; no
> reaching above the shoulder with right arm; occasional reaching below the shoulder
> with the right arm; occasional handling and frequent fingering with right hand; and
> no exposure to workplace hazards such as unprotected heights and machinery.

(R. at 25.)  When assessing Plaintiff's RFC, the ALJ considered the record evidence, including,

*inter alia*, records documenting Plaintiff's diagnoses and treatments.  (R. at 26–31.)  The ALJ

also considered a number of medical opinions and discussed the weight that was assigned to each

of them.  (*Id*. at 29–30.)

At step four, the ALJ determined that Plaintiff could not perform his past relevant work.

(R. at 31.) At step five, the ALJ relied on testimony from a Vocational Expert ("VE") to

determine that in light of Plaintiff's age, education, work experience, and RFC, jobs existed in

significant numbers in the national economy that he could perform.  (R. at 31–32.)  The ALJ

therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 32.)

---

[2] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations."  20
C.F.R. § 4040.1545(a)(1).

## III.    RELEVANT RECORD EVIDENCE[3]

### A.    Plaintiff's Testimony

At the March 19, 2019 hearing, Plaintiff, who was represented by counsel, testified that he started working at Dollar General in 2011 as a loader taking items off conveyor belts and loading carts that he pushed into trailers. (R. at 69.) Plaintiff explained that he was injured when lifting a heavy box at that job in 2012. (R. at 69–70.) Plaintiff also testified that he was right-handed and that he could drive but had to use his left hand to put his vehicle in gear. (R. at 66, 67.) Plaintiff stated that it was hard for him to really do anything because any type of "tug" on his right arm caused pain in his shoulder and bicep and across his chest. (R. at 79–80.) Plaintiff indicated that although he was not receiving treatment at the time of the hearing, he had previously received cortisone shots, which helped for about a week. (R. at 80.) He also explained that he had undergone three shoulder surgeries and rehabilitation, that he had reached a plateau in his rehabilitation efforts, and that his shoulder had gotten progressively worse. (R. at 76–77, 78–80.)

Plaintiff also described a typical day. (R. at 81–82.) He would wake up from sleeping in a chair because he could not sleep in a bed. (*Id.*) He would attempt to do housework, but he had to stop every 10-to-15 minutes to allow his pain to ease up. (R. at 81.) He would try to do something else to achieve a sense of accomplishment. (*Id.*) He needed to rest because standing or walking caused him pain when his arm hung for too long. (*Id.*) He would sometimes wear his sling and sometimes use only his left arm. (*Id.*) Plaintiff also napped for 20 minutes several times during the day because of his difficulties sleeping in a bed. (R. at 83.) He could not tie

---

[3] Discussion of the evidence is limited to those portions bearing directly on Plaintiff's allegation of error.

shoes, button shirts, or write with his right hand. (R. at 83.) He made efforts to help, but his wife did most of the housework. (R. at 84.)

## B. Medical Records

### 1. Plaintiff's Surgery and Physical Therapy

The record reflects that Plaintiff injured his right shoulder while working on May 14, 2012. (R. at 317, 338, 1174.) An MRI of Plaintiff's right shoulder on June 29, 2012, showed edema and moderate degenerative changes at the AC joint. (R. at 297.) The rotator cuff also showed increased signal and thinning of the articular surface of the infraspinatus suggestive of a low-grade undersurface tear. (*Id*.) In addition, Plaintiff had an osteochandral injury to the posterolateral, superior humeral head. (*Id*.) Plaintiff was referred to Dr. Samuel Finck. (R. at 1174–76.) On August 21, 2012, Plaintiff reported that his pain had improved, and an examination showed that he had a "pretty good range of motion." (R. at 1175.)

On November 6, 2012, Plaintiff treated again with Dr. Finck. (R. at 1168.) He reported reinjuring his shoulder on October 25, 2012, while lifting at work. (*Id*.) Dr. Finck found that Plaintiff had pain, but full range of motion and 5/5 strength in his right shoulder. (*Id*.) Plaintiff received a cortisone shot. (*Id*.) On December 18, 2012, Plaintiff appeared to be better since his last visit. (R. at 1169.)

A right shoulder examination Dr. Finck performed on March 28, 2013, revealed that Plaintiff had a full range of motion actively, but he continued to have weakness secondary to pain in the AC joint with any resistance. (R. at 1170.) Plaintiff received a cortisone injection. (*Id*.) On May 29, 2013, Dr. Finck performed a right-shoulder arthroscopy subacromial decompression DCE and limited debridement of the cuff and labrum. (R. at 1172, 893–95.) At a post-operative follow up visit with Dr. Finck on June 12, 2013, Plaintiff had no significant pain

over the AC joint. (R. at 1173.) At a second visit on July 30, 2013, however, he had mild pain over the AC joint. (R. at 1177.) Plaintiff also had the following active ranges of motion: 170° forward flexion; 85° abduction; and 50° external rotation. (*Id*.) However, Plaintiff's strength score was 5/5 in his supraspinatus, infraspinatus, and subscapularis. (*Id*.)

On September 10, 2013, Plaintiff's pain was well controlled with medications, and his incisions were healed. (R. at 1178.) Plaintiff's active ranges of motion were not normal, and he had some pain over the AC joint and the coracoid process, but he was neurovascularly intact distally in the operative extremity. (*Id*.) Plaintiff's strength was also 5/5 in his supraspinatus, infraspinatus, and subscapularis. (*Id*.)

Plaintiff participated in physical therapy, which included a work-hardening program that he completed on December 24, 2013. (R. at 778–86.) At program completion, Plaintiff's right shoulder flexion, abduction, and internal rotation were not within normal limits and he had some difficulty with overhead activity, but he was able to lift and carry up to 35 pounds infrequently, 26 pounds occasionally, and he functioned at a medium physical demand level. (*Id*.)

On November 12, 2013, Plaintiff treated with Dr. Finck. (R. at 306.) Plaintiff's active ranges of motion were not normal, he had mild pain over the AC joint, and mild-to-moderate pain over the anterior shoulder in the supraspinitus region and the bicipital groove. (*Id*.) But Plaintiff was neurovascularly intact distally in the operative extremity, and he had 5/5 strength in his supraspinatus, infraspinatus, and subscapularis. (*Id*.)

On December 31, 2013, Dr. Finck noted that although Plaintiff reported that physical therapy had been helpful, he had a 35-pound lifting limit. (R. at 307.) Upon examination, Plaintiff's active ranges of motion were still not within normal ranges. (*Id*.) Plaintiff's strength

testing was the same. (*Id.*) Dr. Finck noted Plaintiff's labral pathology and a partial tear of the rotator cuff and wrote that these may have been contributing to Plaintiff's slow progress. (*Id.*)

On January 7, 2014, Plaintiff had an MRI arthrogram. (R. at 294–95.) It appeared that there was interval progression of the undersurface tear of the distal infraspinatus tendon near the myotendinous junction. (*Id.*) Findings suggested a delamination-type tear. (*Id.*) On January 21, 2014, Dr. Finck recommended operative intervention. (R. at 1181.)

On March 5, 2014, Dr. Finck performed a right shoulder arthroscopic rotator cuff repair, a SLAP repair, and biceps tenodesis. (R. at 309.) At a follow-up appointment on March 19, 2014, Plaintiff's pain was well controlled with medications, he had no significant pain over his AC joint, and he was neurovascularly intact distally in the operative extremity. (*Id.*) At a post-operative follow up appointments in March, April, June, July, and August 2014, Plaintiff had no significant pain over the AC joint and no evidence of a popeye's sign. (R. at 310, 1185, 1187, 1188, 1190.) He did not have, however, full active ranges of motion at these visits. (*Id.*)

Plaintiff participated in physical therapy that included a work conditioning program that he completed on September 18, 2014. (R. at 339–56.) Plaintiff had limited range of motion and strength in his right shoulder, pain affected his function, and he was unable to perform the demands of his job, which was medium. (R.at 351, 355.) He did, however, demonstrate the ability to perform work at the light-medium physical level. (R. at 355.)

On October 2, 2014, Dr. Finck examined Plaintiff and found that he had mild pain over the AC joint. (R. at 1192.) A right shoulder arthrogram was done on October 23, 2014. (R. at 312–13, 1193.) Although there was no acute abnormality, there was mild tendinopathy of the distal infraspinatus and supraspinatus tendons that might have been related to the injection procedure, or alternatively, a pinhole tear. (*Id.*) There was also degenerative change at the AC

joint. (*Id.*) At a visit on November 6, 2014, Plaintiff reported that he had pain in the area below

his bicep tenodesis. (R. at 1194.) Dr. Finck found that Plaintiff had tenderness maximally with

palpitation over that area and a mild positive Speed's test. (*Id.*) Nevertheless, Plaintiff had full

range of motion in his right shoulder and was neurovascularly intact distally. (*Id.*) Plaintiff

subsequently received a cortisone injection in the right bicep. (R. at 1196.) On December 16,

2014, Dr. Finck wrote that Plaintiff continued to have tenodesis site pain and that he believed

that an open biceps tenodesis would allow Plaintiff to return to his full capabilities at his job. (R.

at 1197.)

　　Plaintiff saw Dr. Finck again on January 14, 2015, for right shoulder pain secondary to

continued bicep tendonitis. (R. at 315.) Dr. Finck wrote that they had applied for surgery to

address the right shoulder bicep tendonitis and retained suture hardware but that there were no

new approvals at that point. (*Id.*) A cortisone shot seemed to take away some of Plaintiff's pain.

(*Id.*)

　　An independent medical examination was done on February 25, 2015. (R. at 317–20.)

Plaintiff had 180° of forward flexion in the right upper extremity; 60° extension; 130° abduction;

20° adduction with discomfort; 80° internal rotation; and 70° external rotation. (*Id.*) He had

tenderness and palpitation over the lateral and anterior portion of his shoulder, mildly positive

Hawkins impingement sign; and positive results for a Scarf test, Speed's test, and an empty can

test for bicep pain. (*Id.*) But he had normal sensation and good strength in the biceps and

triceps. (*Id.*)

　　Plaintiff treated with Dr. Finck again on May 27, 2015. (R. at 1200.) Plaintiff continued

to have pain in the bicep region and right shoulder. (*Id.*) On June 30, 2015, Dr. Finck wrote that

Plaintiff had pain primarily over the anterior shoulder and the biceps tendinitis site. (R. at 326–

27.) A cortisone shot seemed to take away some of the pain, but he still had pain when lifting and possible synovitis related to his suture knots. (*Id*.) Dr. Finck's right upper extremity examination findings were not different from findings at recent prior visits. (*Id*.) Plaintiff was scheduled for a third surgery. (R. at 362.)

Plaintiff participated in physical therapy that included a work conditioning program that he completed on December 10, 2015. (R. at 917–75.) At program completion, Plaintiff was exhibiting the ability to perform work at a light physical demand level. (R. at 968.)

At post-operative appointments with Dr. Finck in July, September, October, and December 2015, and January 2016, Plaintiff had no significant pain over the AC joint and no evidence of popeye's sign. (R. at 1205, 1207, 1209, 1211.) He was also neurovascularly intact distally in the operative extremity at these visits, and his rotator strength testing scores generally improved from 3/5 to 5/5. (*Id*.) On January 6, 2016, however, Plaintiff was mildly tender over the OBT site. (R. at 1211.) Dr. Finck applied for an MRI to evaluate Plaintiff's labral tear repair integrity. (R. at 1212, 1213.) That MRI, which was done on January 19, 2016, revealed partial tears of the supraspinatus and infraspinatus as well as tearing/fraying of the superior/posterior lebrum. (R. at 1214.) On February 9, 2016, Plaintiff had sharp pain over the anterior shoulder near the arthroscopic biceps tenodesis site and pain over his AC joint. (*Id*.) Dr. Finck recommended a surgical consult to see if there would be any benefit to further surgery. (*Id*.)

On April 12, 2016, Dr. Finck discussed with Plaintiff the results of the surgical consult. (R. at 1216.) Dr. Finck conveyed that the consultant did not feel that surgery was necessarily the answer, and that work conditioning or work hardening might be. (*Id*.) On May 31, 2016, an examination revealed that Plaintiff had full flexion but with discomfort starting at 140°, and 85° external rotation with the arm abducted and internal rotation in the upper lumbar area. (R. at

1218.) Plaintiff's strength scores were 4+/5 supraspinatus, 5-/5 infraspinatus, and 5/5 subscapularis. (*Id*.) Dr. Finck planned for Plaintiff to continue physical therapy and light duty work and to apply for work conditioning. (*Id*.)

Plaintiff participated in physical therapy that included a work hardening program that he completed on June 30, 2016. (R. at –1080.) Upon discharge, Plaintiff had shoulder flexion of 145°–150°, shoulder abduction from 153°–160°, external rotation from 80° to within normal limits, and internal rotation from 60°–80°. (R. at 1075–76.) Dr. Finck examined Plaintiff both during and after his participation in the work hardening program. On June 29, 2016, Dr. Finck found that Plaintiff had full flexion but with discomfort starting at 140°–150°, and 85° external rotation with the arm abducted and internal rotation in the upper lumbar area. (R. at 1221.) Plaintiff's rotator cuff muscle strength scores were 4+/5 supraspinatus, 5-/5 infraspinatus, and 5/5 subscapularis. (*Id*.) He had, however, a positive Speed's test. (*Id*.) Dr. Finck wrote that the plan was for Plaintiff to return to light duty with a 15-20 pound lifting restriction. (*Id*.) On August 2, 2016, Plaintiff reported experiencing pain after using a weed eater. (R. at 1224.) Upon examination, however, his right shoulder motion was still nearly full, and his rotator cuff strength was unchanged. (R. at 1225.)

An impairment medical examination was done on April 17, 2017. (R. at 1232–33.) Plaintiff reported that his only treatment at that time was that he was taking Flexeril and Vicodin. (*Id.*) Plaintiff had tenderness to palpitation over the anterior, superior, and lateral aspect of the right shoulder joint without crepitus or gross ligamentous laxity. (*Id*.) Manual muscle testing of strength in the right shoulder and right biceps area showed inconsistent give-way with pain inhibition in the shoulder and right bicep region. (*Id*.) Plaintiff's right shoulder motion showed restrictions. (*Id*.)

### 2.  Records and Opinions from Plaintiff's Primary Care Physician, Dr. Myers

Plaintiff's primary care physician, Dr. Myers, routinely treated Plaintiff for essential hypertension.  Dr. Myers' treatment notes from 2015 contain numerous references, however, to Plaintiff's shoulder issues.  On June 23, 2015, Dr. Myers, examined Plaintiff and found that his extremities were all normal.  (R. at 1108.)  On September 29, 2015, Dr. Myers noted that Plaintiff had undergone shoulder surgery nine weeks prior and had just begun work hardening in physical therapy.  (R. at 1107.)  Upon examination, Dr. Myers also wrote that Plaintiff's shoulder was healing.  (*Id*.)  On December 29, 2015, Dr. Myers wrote that Plaintiff was still "doing exercises and rehab from his shoulder surgery."  (R. at 1105.)

Notes from 2016 also contain information about Plaintiff's shoulder issues.  Dr. Myers examined Plaintiff on March 14, 2016, and determined that he had no cyanosis, clubbing, or edema in his extremities.  (R. at 1104.)  He diagnosed Plaintiff with primary osteoarthritis involving multiple joints.  (*Id*.)  On July 5, 2016, Dr. Myers examined Plaintiff and found that he had flexion, abduction, and internal and external rotation with mild discomfort and some persistent loss of motion.  (R. at 1100.)  Dr. Myers also wrote that there was "abduction to approximately 90° as well as forward flexion" and that "[t]his is done with some mild stiffness and pain still."  (*Id*.)  On October 4, 2016, Dr. Myers wrote that Plaintiff was "having issues with continued pain in his right shoulder and has lost his employment due to not being able to perform his job.  He has tried work but is unable."  (R. at 1098.)  Upon examination, Plaintiff had no arthritic changes or edema in his extremities.  (*Id*.)

Dr. Myers continued to treat Plaintiff in 2017.  On January 3, 2017, Dr. Myers wrote that Plaintiff continued to have daily pain in his shoulder and that Plaintiff was not working.  (R. at 1096.)  At that time, Plaintiff had no arthritic change or edema in his extremities and normal grip

strength, but he had pain with full range of motion in his shoulder and pain with abduction and flexion above 45 degrees.  (R. at 1096.)

On February 21, 2017, Dr. Myers wrote a letter to Opportunities for Ohioans With Disabilities ("OOWD").  (R. at 1231.)  In it, Dr. Myers stated that Plaintiff suffered from hypertension and chronic right shoulder pain and that although Plaintiff's blood pressure was controlled with medication, his right shoulder condition was disabling.  (*Id*.)  Dr. Myers explained that Plaintiff underwent surgery in 2014 to treat a SLAP and a rotator cuff tear and that in 2015, Plaintiff had undergone a revision and repair of an extension of the labral tear.  (*Id.*)  Dr. Myers also wrote that despite extensive rehabilitation, Plaintiff's shoulder had limited range of motion in both flexion and extension and that he experienced daily pain.  (*Id*.)  Dr. Myers wrote that Plaintiff was unable to work with this injury and pain.  (*Id*.)  Dr. Myers wrote a second letter to OOWD on March 28, 2017, indicating that there had been no change to Plaintiff's condition.  (R. at 1230.)

During examinations during the rest of 2017 and in January 2018, Dr. Myers noted that Plaintiff had no arthritic changes or edema in his extremities.  (R. at 1270, 1268, 1266, 1264.)  An examination on July 11, 2017, however, revealed that Plaintiff's shoulder had pain with limited range of motion.  (R. at 1268.)  At an examination on October 11, 2017, Plaintiff's right shoulder and trapezius muscle were tender with full range of motion.  (R. at 1266.)  On January 11, 2018, Plaintiff's right shoulder had limited range of motion.  (R. at 1264.)  During this period, Plaintiff reported daily pain in his right shoulder and right hand.  (R. at 1269, 1267, 1266, 1264.)

Dr. Myers continued to treat Plaintiff in 2018.  On January 17, 2018, Plaintiff reported daily pain and discomfort in his right shoulder and into his right bicep.  (R. at 1260.)  Dr. Myers'

12

examination revealed that Plaintiff's shoulder had limited motion. (R. at 1262.) Additionally, although there was tenderness into the bicep tendon associated with known tendinosis, it did not limit Plaintiff's range of motion as that was an issue with his shoulder. (*Id*.) Dr. Myer wrote that Plaintiff's post-operative and rehabilitation pain had become chronic. (R. at 1263.) He planned to continue to have Plaintiff stretch daily to improve his range of motion, flexibility, and strength, but he could not offer any other suggestions for Plaintiff's shoulder. (*Id.*)

On April 11, 2018, Plaintiff's shoulder had no cyanosis or edema, but he only had flexion to 50° and abduction to 45° before he had pain and loss of motion. (R. at 1258.) On July 11, 2018, there was no arthritic changes or edema in Plaintiff's extremities, but his right shoulder had limited range of motion in flexion/extension and abduction and rotation. (R. at 1253.) Plaintiff also had pain with movement. (*Id*.) Plaintiff's hydrocodone-acetaminophen prescription was nevertheless discontinued at that time because it was no longer needed. (R. at 1254.)

On September 18, 2018, Plaintiff sought treatment for arm pain. Plaintiff reported that he had an incident at home several days before his office visit, during which he experienced mild aching pain in his shoulder. (R. at 1251.) There was, however, no injury mechanism. (*Id*.) Plaintiff had also noticed a bruise on the inside of his arm near his shoulder, but he had no pain or discomfort with a full range of motion. (*Id*.) A musculoskeletal examination revealed normal range of motion, and that Plaintiff had no edema, tenderness, or deformity. (*Id*.) Dr. Myer wrote that "without specific injury . . . this most likely represents scar tissue from previous surgery and treatment on [Plaintiff's] right shoulder that is torn and cause a small amount of bleeding and/or muscle fiber tear." (R. at 1252.) Dr. Myer noted again that Plaintiff had full range of motion and that his strength was normal. (*Id*.) On October 19, 2018, however, Plaintiff

13

had mild arthritic changes in his extremities and his shoulder was more painful with partial range of motion only. (R. at 1249.)

On November 2, 2018, Dr. Myer authored a letter to Plaintiff's counsel. (R. at 1281–82.) In it, he indicated that Plaintiff suffered an acute injury to his right shoulder in 2012 and that he subsequently underwent three surgeries for a torn rotator cuff and a labral tear. (*Id*.) Dr. Myer noted that Plaintiff had undergone significant physical therapy due to persistent pain and loss of motion in his shoulder and that he currently had flexion of his shoulder to 90°; abduction to 60°; extension to 15°; and some loss of motion with both internal and external rotation, all of which were associated with pain at the end point, and that Plaintiff had pain with full flexion and abduction to those levels. (*Id*.) Dr. Myers wrote that Plaintiff's motion had not improved since his last surgery, that Plaintiff had permanent limitations, and that repetitive motion of Plaintiff's right shoulder and any lifting exacerbated Plaintiff's symptoms and increased his pain. (*Id*.)

The following day, Dr. Myers completed a Medical Source Statement in which he opined the following limitations. (R. at 1283–85.) Plaintiff could never lift 21–50 pounds; rarely lift 11–20 pounds; occasionally lift 6–10 pounds; and frequently lift 1–5 pounds. (*Id*.) Plaintiff could rarely reach with his right hand/arm and that that he could not "fully do, due to loss of right shoulder range of motion." (*Id*.) Plaintiff could occasionally handle and frequently finger with his right hand. (*Id.*) Plaintiff could also frequently bend and climb steps, and could occasionally crouch/squat, crawl, and climb ladders. (*Id*.) Plaintiff was unable to reach above shoulder level with his right hand. (*Id*.) Moreover, Plaintiff's condition was likely to deteriorate if placed under stress associated with a job, and he would have two or more unscheduled absences a month. (*Id*.) Dr. Myers indicated that his assessment was premised on his diagnosis of chronic shoulder pain, right shoulder rotator cuff tear, and right shoulder capsulitis. (*Id.*) Dr.

Myers additionally indicated that Plaintiff's condition had existed and persisted since August 11, 2016.  (*Id.*)

On January 1, 2019, Dr. Myers treated Plaintiff.  At that time, Dr. Myers wrote that Plaintiff was still having issues with pain in his right shoulder and that an examination revealed mild arthritic changes and loss of motion but no edema.  (R. at 1333.)

### 3.  State Agency Reviewer's Opinions

On March 6, 2016, Steven Sutherland, MD, reviewed Plaintiff's file at the initial level and opined that Plaintiff had the following limitations.  Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently.  (R. at 101.)  Plaintiff could stand and/or walk and sit for about 6 hours in an 8-hour work day.  (*Id.*)  Plaintiff could only occasionally push and/or pull with his right upper extremity due to ongoing shoulder pain and treatment.  (*Id.*)  Plaintiff could never crawl or climb ladders, ropes, or scaffolds.  (*Id.*)  Plaintiff was also limited to no more than occasional overhead and front or lateral reaching above the shoulder level with his right arm, but he could do unlimited front and lateral reaching below shoulder level with his right arm.  (R. at 102.)  Plaintiff was also unable to be exposed to unprotected heights.  (*Id.*)  State agency reviewer, Anne Prosperi, D.O., reviewed Plaintiff's file during reconsideration and opined the same limitations.  (R. at 115–17.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to

that  finding 'even if there is substantial evidence in the record that would have supported an

opposite  conclusion.'"    *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v.

Callahan*, 109  F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the

substantial  evidence standard, "a decision of the Commissioner will not be upheld where the

SSA fails to  follow its own regulations and where that error prejudices a claimant on the merits

or deprives  the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742,

746 (6th Cir. 2007).

## V.     ANALYSIS

As previously explained, Plaintiff alleges that the ALJ erred when evaluating Dr. Myers'

opinions.  (ECF No. 14, at PageID 1395–21.)  That allegation of error is well taken.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case. 20 C.F.R. § 416.927(c).[4]  Where a treating source's opinion, like that of Dr.

---

[4] Plaintiff's application was filed on February 8, 2017.  (R. at 195.)  Accordingly, it is governed
by regulations applicable to claims filed prior to March 27, 2017.

Myers, is submitted, the ALJ generally gives deference to it "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . . " 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating physician's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [a claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that

> his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that an ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's RFC and a determination on whether a claimant meets the statutory definition of "disabled." 20 C.F.R. §§ 404.1527(d), 416.927(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of [a claimant's] impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492–93 (6th Cir. 2010).

> The ALJ analyzed and discussed Dr. Myers' opinions as follows:

> Little weight is given to the opinion of Douglas A. Myers at Exhibit 10F dated February 21, 2017. Dr. Myers' opinion that the claimant's shoulder is disabling and he is unable to work pertains to an issue reserved to the Commissioner. It further is not consistent with Dr. Douglas's [*sic*] own objective findings made near the same time. Treatment records from January 2017 note no arthritic changes or

edema. While the claimant had right shoulder pain, he performed full range of motion and his grip strength remained normal. Furthermore, despite his reports of the claimant's significant and disabling pain, there is no evidence Dr. Myers prescribed the claimant and [*sic*] narcotic pain medication or anti-inflammatory medications (Exhibit 10F). The claimant testified at the hearing he took no prescription pain medication. Therefore, Dr. Myers [*sic*] opinions are not well supported and are not consistent with the objective medical evidence.

Similarly, little weight is given to the November 2018 opinions of Dr. Myers at Exhibits 18F and 10F. The extreme lifting, carrying and reaching limitations, as well has his opinions as to the claimant's absence from work are not well supported by his own treatment records. Dr. Myer's [*sic*] most recent treatment of the claimant has related primarily to hypertension management, with limited physical examination. Examination findings are limited, noting occasion [*sic*] limited range of motion of the right shoulder. However, the claimant remains motor, sensory, and vascularly intact (Exhibit 17F). Dr. Myers reports that the claimant's attempts to use his right shoulder have been met with prolonged episodes of pain and inability to perform tasks. Yet this is not documented in his own treatment records (Exhibit 17F, 18F)). Furthermore, despite these reported exacerbations of pain, Dr. Myers has not recently prescribed the claimant with any medications, such as narcotic pain medications, or any anti-inflammatories, or other pain medications for his shoulder pain (Exhibit 17F). On the contrary, the claimant's hydrocodone was discontinued in July 2018 as the claimant no longer needed it (Exhibit 17F/6). Again, his most recent treatment records in January 2019 do not document any additional pain medication, muscle relaxers, or anti-inflammatory prescriptions (Exhibit 23F). The undersigned further notes that Dr. Myers is not an orthopedist or pain management specialist, and there is no indication he referred the claimant to pain management, despite his reports of the claimant's disabling shoulder pain. Furthermore, the claimant testified he was not currently taking any pain medication.

(*sic*) (R. at 30.)

The undersigned finds that the ALJ erred when analyzing Dr. Myers' November 2018 opinion. The ALJ concluded that Dr. Myers' November 2018 opinion was not well supported by his own treatment records. (*Id*.) Specifically, the ALJ concluded that Dr. Myers' most recent treatments were related primarily to hypertension management with limited physical examinations and that his limited examinations noted that Plaintiff occasionally had limited range of motion in his right shoulder. That conclusion is belied, however, by the record, which demonstrates that Dr. Myers routinely examined Plaintiff's shoulder and regularly found that

Plaintiff had pain and limited range of motion.  On July 5, 2016, Dr. Myers found that Plaintiff

had flexion, abduction, and internal and external rotation with mild discomfort and some

persistent loss of motion.  (R. at 1100.)  On January 3, 2017, Plaintiff had pain with full range of

motion in his shoulder and pain with abduction and flexion above 45°.  (R. at 1096.)  On July 11,

2017, Plaintiff's shoulder had pain with limited range of motion.  (R. at 1268.)  On October 11,

2017, Plaintiff's right shoulder and trapezius muscle were tender with full range of motion.  (R.

at 1266.)  On January 11, and 17, 2018, Plaintiff's right shoulder had limited range of motion.

(R. at 1264, 1262.)  On April 11, 2018, Plaintiff only had flexion to 50° and abduction to 45°

before he had pain and loss of motion.  (R. at 1258.)  On July 11, 2018, Plaintiff's right shoulder

had limited range of motion in flexion/extension and abduction and rotation and pain with

movement.  (R. at 1253.)  On October 19, 2018, Plaintiff's shoulder was more painful with

partial range of motion only.[5]  (R. at 1249.)  On January 1, 2019, Dr. Myers wrote that Plaintiff

had mild arthritic changes and loss of motion.  (R. at 1333.)  In short, Dr. Myers's examinations

were not limited, and his loss of motion findings were more than occasional.

The ALJ also concluded that Dr. Myers' treatment records did not support his report that

Plaintiff's attempts to use his right shoulder had been met with prolonged episodes of pain and

inability to perform tasks.  (R. at 30.)  That conclusion is also belied by the record.  On October

4, 2016, Dr. Myers wrote that Plaintiff was "having issues with continued pain in his right

shoulder and has lost his employment due to not being able to perform his job.  He has tried

work but is unable."  (R. at 1098.)  On January 3, 2017, Dr. Myers wrote that Plaintiff continued

---

[5]In a letter dated November 2, 2018, one day before Dr. Myer's authored the November 2018
opinion at issue, Dr. Myers indicated that Plaintiff had flexion of his shoulder to 90°; abduction
to 60°; extension to 15°; and some loss of motion with both internal and external rotation, all of
which were associated with pain at the end point, and that Plaintiff had pain with full flexion and
abduction to those levels.  (R. at 1281–82.)

to have daily pain in his shoulder and that Plaintiff was not working. (R. at 1096.) Throughout 2017, Dr. Myers wrote that Plaintiff reported daily pain in his right shoulder and right hand. (R. at 1269, 1267, 1266.) On January 11, 2018, Dr. Myers noted that Plaintiff continued to have daily pain and discomfort in his shoulder and permanent loss of function. (R. at 1264.) On January 17, 2018, Dr. Myers wrote that Plaintiff reported daily pain and discomfort in his right shoulder and into his right bicep. (R. at 1260.) In short, Dr. Myers' records reflect consistent reports of pain, discomfort, and loss of function. These reports are buttressed by Dr. Myers' examination findings, which, as described above, regularly found that Plaintiff had pain and limited range of motion in his shoulder.

In summary, given the ALJ's mischaracterization of Dr. Myers' treatment notes, the undersigned cannot conclude that the ALJ's reasons for discounting Dr. Myers' November 2018 opinion are supported by substantial evidence.

## VI.    RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this R&R.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Disrict Judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE